# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　　*Plaintiff-Appellant,*

　　　　　v.

PARK PLACE ASSOCIATES, LTD., a
California limited partnership;
GEORGE HARDIE; KARD KING, INC.,
a California corporation,
　　　　　*Defendants-Appellees.*

No. 05-56235

D.C. No.
CV-04-08387-DT

UNITED STATES OF AMERICA,
　　　　　　*Plaintiff-Appellee,*

　　　　　v.

PARK PLACE ASSOCIATES, LTD., a
California limited partnership;
GEORGE HARDIE; KARD KING, INC.,
a California corporation,
　　　　　*Defendants-Appellants.*

No. 05-56312

D.C. No.
CV-04-08387-DT

OPINION

Appeal from the United States District Court
for the Central District of California
Dickran M. Tevrizian, District Judge, Presiding

Argued May 10, 2007
Submitted April 15, 2009
Pasadena, California

Filed April 22, 2009

Before: Barry G. Silverman, Kim McLane Wardlaw, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee

**COUNSEL**

Peter D. Keisler, David M. Cohen, Franklin E. White, Jr., Civil Division, Department of Justice, Washington, DC, for the petitioner-appellant.

Christopher H. Buckley, Jr., Daniel W. Nelson, Thomas H. Dupree, Jr., Amir C. Tayrani, Gibson, Dunn & Crutcher, Washington, DC, for the respondents-appellees.

**OPINION**

BYBEE, Circuit Judge:

An arbitration panel in Los Angeles awarded Park Place Associates, Ltd. $93,612,892 against the United States, after a proceeding in which the United States declined to participate. Under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq*., where a controversy has been arbitrated pursuant to a valid arbitration provision and the arbitrator has made an award, the parties may seek to confirm, *see* 9 U.S.C. § 9, or to vacate, *see* 9 U.S.C. § 10, that award in the appropriate

court. The District Court for the Central District of California denied the United States' motion to vacate the award and granted Park Place's motion to confirm the award.

Because we, no less than private parties, "must turn square corners" when we deal with the government as a litigant, *Rock Island, A. & L. R. Co. v. United States*, 254 U.S. 141, 143 (1920), we find that, under the unique circumstances presented here, the district court had jurisdiction over the United States' motion to vacate, and we affirm the district court's order denying that motion. However, we find that the district court had no authority to confirm the arbitration award against the United States and we vacate the district court's order granting Park Place's motion.[1] We remand to the district court with instructions to dismiss the action to confirm as barred by sovereign immunity.

## I.   FACTS AND PROCEEDINGS

The events at issue span twenty years, resulted in congressional hearings, and involve litigation in three circuits. We are not sure if the appropriate literary metaphor belongs to Tolstoy or to Kafka, but we are going to set forth the history of this case in some detail.

The contract and arbitration provision that governs the current dispute was part of an agreement between two private parties and did not involve the United States. In 1983, Park Place entered into a Joint Venture Agreement ("JVA") with LCP Associates to develop, own, and operate the Bell Gardens Bicycle Club ("Club"), a legal card-playing club in Bell Gardens, California. Section 5.03 of the JVA set out procedures for dispute resolution between the contracting parties, requiring that the parties arbitrate controversies arising under the JVA in Los Angeles County, California; that an arbitration

---

[1]Because the district court could not validly confirm the arbitration award, we do not reach the question of interest on the award.

award would be "final and binding"; and that "judgment may be entered [on an arbitration award] in any court of competent jurisdiction in the State of California."[2] Park Place originally held a thirty percent interest and LCP held the remaining seventy percent interest in the Club, which opened for business in November 1984.[3] In 1987, after certain loans were repaid, Park Place's share increased to thirty-five percent and LCP's interest decreased to sixty-five percent.

## A.    *Forfeiture of the Club*

What Park Place did not know was that LCP had financed more than twelve million dollars of the initial investment using the proceeds of a drug trafficking ring. *United States v. Gilbert*, 244 F.3d 888, 894 (11th Cir. 2001). The United States discovered this fraudulent activity following a money laundering investigation, and in 1987, indicted various individuals, including some LCP partners, in the Southern District of Florida. In March 1990, certain LCP partners were convicted of laundering the profits of a drug-smuggling business. In April 1990, a jury returned a verdict in favor of the United States in a subsequent forfeiture proceeding pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1963. In response, the Southern Dis-

---

[2]In full, section 5.03 provides:

5.03 *Arbitration.*

Any dispute or controversy arising under, out of, in connection with, or in relation to this Agreement, or any breach thereof, or in connection with the dissolution thereof, shall be determined and settled by arbitration in Los Angeles County pursuant to the rules of the American Arbitration Association. Any award rendered therein shall be final and binding on all of the parties, and judgment may be entered thereon in any court of competent jurisdiction in the State of California.

[3]By 1990 the Club was reportedly the largest card club in the world. The Club differs from a Las Vegas-style casino in that the house has no stake in the game, but makes its money by charging players a fee for playing. *See United States v. Gilbert*, 244 F.3d 888, 893 n.5 (11th Cir. 2001).

trict of Florida entered an order forfeiting the entire Club to the United States *in rem* and freezing all distributions to LCP, Park Place, and their respective partners. In either May or September 1990, the district court confirmed that Park Place was an innocent owner and returned its thirty-five percent interest in the Club.

The United States retained its interest in LCP following the forfeiture proceedings. By August 1993, as the result of negotiated settlements with LCP partners, the United States ultimately obtained a fifty-five percent interest in LCP. Consequently, the United States controlled the LCP partnership and, because LCP was the majority shareholder in the venture, possessed effective control of the Club under the terms of the JVA. From 1990 to 1999, the United States managed its interest in LCP—and the Club—through a series of trustees appointed by the Southern District of Florida on its behalf. The United States continued its control of the Club's management until it sold its LCP interests in May 1999.[4] According to Park Place, the Club's value declined dramatically during the period the United States managed it.

B.   *Court Proceedings*

The arbitration underlying this litigation concerns the United States' conduct during its eight-year management of the Club. Early on, Park Place disputed the forfeiture proceedings, the United States' right to sell the seized interests, and trustee compensation. Park Place brought these claims, which are not part of the present action, in the Southern District of Florida. Separately, in proceedings leading to the arbitration underlying this litigation, Park Place sought recovery for the United States' conduct after the forfeiture. Specifically, Park Place pursued relief for what it claimed was the United States'

---

[4]Two years after the United States divested its interest in the Club, the Eleventh Circuit declared the forfeiture proceedings void. *Gilbert*, 244 F.3d at 922.

gross mismanagement of the Club.[5] As will be explained, Park Place proceeded on this second set of claims in a series of courts.

In June 1997, Park Place served the successor trustee, as general partner of LCP, with an arbitration demand under section 5.03 of the JVA, for alleged breaches of various provisions of the JVA and violations of California law in connection with the management of the Club. In response, the United States filed a motion for an order to show cause, requesting that the Southern District of Florida preclude Park Place from continuing with the arbitration on forfeiture-related issues pending before the court. In May 1998, the Southern District of Florida issued an order staying the arbitration in part, but allowing it to proceed as to claims concerning the United States' daily operation of the Club. As directed by the court, Park Place withdrew several claims from its arbitration demand, but it maintained the claims as to the Club's management. Shortly thereafter, Park Place requested the American Arbitration Association ("AAA") to hold the arbitration matter in abeyance until May 1999. That arbitration demand was never revived.

In April 1998, Park Place filed suit in the Central District of California seeking, among other things, damages in excess of $150 million against the United States. As it had in the Southern District of Florida, Park Place asserted that the United States mismanaged the Club during the eight years of its control. Specifically, Park Place claimed the United States failed to dispose promptly of its interest in the Club; failed to protect Park Place's rights and interests; and failed to preserve and protect the Club's value as an ongoing business by, for example, failing to hire or train competent and experienced

---

[5]The mismanagement claims triggered at least one congressional hearing: *Asset Forfeiture Program: A Case Study of the Bicycle Club Casino*, Perm. Subcomm. on Investigations, Comm. on Govt'l Affairs, S. Hrg. 104-526 (1996).

casino managers; failing to modernize the Club's facility; and failing to market the Club when business in the area became increasingly competitive. Park Place asserted claims before the district court pursuant to the Federal Tort Claims Act and the United States Constitution, including negligence, negligent supervision and retention, breach of fiduciary duty, conversion, breach of contract, and breach of the covenant of good faith and fair dealing. It requested money damages, an accounting, and the imposition of a constructive trust. Although Park Place's complaint included a breach of contract claim, it did not mention the Tucker Act as a basis for the district court's jurisdiction over that claim, but instead relied on supplemental jurisdiction for all the state law claims.

The United States moved to dismiss Park Place's complaint, contending that the Central District of California lacked subject matter jurisdiction over Park Place's claims. The Central District of California granted the United States' motion and, in December 1998, dismissed the case with prejudice with respect to all claims except the four contract claims. As to the contract claims, the Central District of California explained that although federal district courts have concurrent jurisdiction with the Court of Federal Claims as to contract claims against the United States not exceeding $10,000, the Court of Federal Claims has exclusive jurisdiction over contract claims in excess of $10,000. *See* 28 U.S.C. §§ 1346(a)(2), 1491(a)(1). The Central District of California directed Park Place to file its contract claims in the proper forum, the Court of Federal Claims.

On October 26, 1999, Park Place filed a complaint in the Court of Federal Claims, again alleging that the United States had breached its contractual obligations to Park Place under the JVA and seeking $150 million in damages. The United States moved to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief could be granted. In August 2000, the Court of Federal Claims granted the United States' motion and dismissed the complaint for

lack of jurisdiction. The court found that because the JVA was a contract between Park Place and LCP, Park Place's lack of privity with the United States deprived the court of subject matter jurisdiction over the breach of contract claims. The court also noted that even if the JVA bound the United States, the arbitration clause in the JVA—to which Park Place had not had recourse—would preclude jurisdiction.

The Federal Circuit vacated the judgment of the Court of Federal Claims and remanded for further proceedings. *Hardie v. United States*, 19 F. App'x 899, 900 (Fed. Cir. 2001) ("*Hardie I*"). The court held that privity of contract was established because "the United States has elected to step into the shoes of the general partner of LCP, and PPA had no choice but to accept its new 'partner.' " *Id.* at 905. It made no difference "that the United States happened to obtain its 'interest' in the Bicycle Club through forfeiture, as opposed to any other means." *Id.* Accordingly, there was "Tucker Act jurisdiction over contract-based claims" even though there was "no literal contract between the plaintiff and the United States." *Id.* The Federal Circuit also rejected the Court of Federal Claims' assumption that the arbitration provision independently precluded jurisdiction.[6] *Id.* at 907.

## C. *Park Place's Arbitration Demand*

On June 16, 2003, Park Place filed a $100 million arbitration demand with the AAA based upon its claims before the Court of Federal Claims, and asked the court to stay the litigation pending the arbitration. In response, the United States requested that the AAA terminate the arbitration or, in the alternative, suspend the proceedings until after the Court of

---

[6]The Federal Circuit also noted that neither party had invoked the arbitration agreement. *Id.* The United States has consistently argued throughout this litigation as an alternative to its opposition on sovereign immunity grounds, that Park Place waived its right to elect arbitration because it chose instead to pursue its claims in the federal courts.

Federal Claims ruled upon Park Place's motion to stay the litigation. Before the arbitration panel, the United States again asserted that, because it was not a named party to the JVA and it acquired the interest in LCP pursuant to its sovereign powers under RICO, it could not be held liable under state law. When the arbitration panel informed the United States that it would proceed absent a court order that arbitration be terminated or suspended, the United States filed a motion with the Court of Federal Claims to enjoin the arbitration proceedings on grounds of sovereign immunity.

In November 2003, the Court of Federal Claims issued an order denying both Park Place's motion to stay the litigation and the United States' motion to stay the arbitration proceedings. The court reasoned that "[g]iven its lack of subject-matter jurisdiction to compel, arrest, or enforce arbitration, and its questionable authority under the JVA to enter an arbitration award [because the choice of law provision calls for entry of an award only in a court of competent jurisdiction 'in the State of California'], the court may not give either party the equitable relief it expects or demands here."

The following month, the United States asked the Federal Circuit for an injunction pending its interlocutory appeal of the Court of Federal Claims' decision, which was denied. In May 2004, the Federal Circuit dismissed the interlocutory appeal for lack of jurisdiction. *Hardie v. United States*, 367 F.3d 1288, 1291 (Fed. Cir. 2004) ("*Hardie II*"). The Federal Circuit rejected the argument that the United States had not waived its sovereign immunity as to binding arbitration. *Id.* at 1290-91. The court reiterated that "the United States was bound by the terms of the [JVA] under the law applicable to contracts between private individuals because it had elected to step into the shoes of the general partner of LCP, and [Park Place] had no choice but to accept its new 'partner' . . . [and c]onsequently, the United States is subject to the arbitration clause of the joint venture agreement just as any private party

would be." *Id.* at 1291 (internal quotation marks omitted) (referring to *Hardie I*, 19 F. App'x at 905).

Meanwhile, in April 2004, a ten-day arbitration hearing took place in Los Angeles. Prior to the hearing, the United States responded to the demand, helped select the arbitration panel members, and participated in the preliminary hearing; however, the United States refused to participate in discovery and failed to attend the arbitration hearing. Following the hearing, the arbitration panel found in favor of Park Place. The panel rejected the United States' immunity argument, noting that the Eleventh Circuit had invalidated the RICO forfeiture proceeding under which the United States had obtained its interest in the Club, *see Gilbert*, 244 F.3d at 922, and that the United States chose to become LCP's general partner, engaged in a concerted effort to obtain control of the Club and reap pecuniary gain, and consequently "shed whatever public personna [sic]" it had and "stepped into the shoes" of the general partner of LCP. In a 67-page award issued in July 2004, the panel found that "[a]s a result of the [United States'] breaching conduct, [Park Place] suffered, and continue[s] to suffer, significant diminution of [its] partnership distributions" and awarded Park Place a total sum of $93,612,892.

D.    *The Current Litigation*

On September 14, 2004, Park Place filed motions in the Court of Federal Claims to confirm the arbitration award and for prejudgment interest. *See* 9 U.S.C. § 9. The United States filed an opposition and later requested that the Court of Federal Claims treat its opposition as a motion to vacate in the event the court concluded it had jurisdiction. *See* 9 U.S.C. § 10.

In the meantime, on October 8, 2004, while the post-arbitration motions were pending before the Court of Federal Claims, the United States filed its own complaint and motion in the Central District of California to vacate the arbitration

award. This is the case before us in this appeal. On November 8, 2004, Park Place asked the Central District of California to stay the action pending final resolution by the Court of Federal Claims.

On December 2, 2004, the Court of Federal Claims denied Park Place's motion to confirm the arbitration award and stayed the case pending resolution of the United States' motion in the Central District of California. The Court of Federal Claims held that it "ha[d] no statutory or other authority to decide or enter judgment on an arbitration award against the government . . . [and] may not hear petitions to vacate or modify an arbitral award because[, under the FAA,] such authority is vested exclusively in the federal district courts." Furthermore, the JVA precluded it from entering relief by specifically providing that "judgment may be entered [on an arbitration award] in any court of competent jurisdiction in the State of California." On December 9, 2004, the Central District of California stayed the action relating to the United States' motion to vacate the arbitration award pending Park Place's appeal to the Federal Circuit.

On March 3, 2005, the United States filed a motion to dismiss Park Place's appeal to the Federal Circuit. In an unpublished order, the Federal Circuit granted the motion and dismissed Park Place's appeal on April 8, 2005. *Hardie v. United States*, 134 F. App'x 434, 436 (Fed. Cir. 2005) ("*Hardie III*"). The Federal Circuit observed that the FAA allows a party to seek confirmation of an arbitration award either in the court specified in the agreement that included the arbitration provision or, if no court is specified in the agreement, in the appropriate district court. *See id.* at 435; *see also* 9 U.S.C. § 9. The Federal Circuit noted that although interlocutory orders are not ordinarily immediately appealable, the FAA permits the interlocutory appeal of certain court orders concerning arbitration, such as the denial of a motion to confirm by such a court. *See Hardie III*, 134 F. App'x at 435-36; *see also* 9 U.S.C. §16(a)(1)(D). However, the Federal Circuit

concluded that *this* order was not appealable, because the Court of Federal Claims was neither the court specified in the JVA, nor a district court properly having jurisdiction over the motion. *Hardie III*, 134 F. App'x at 436.

In April 2005, Park Place filed a motion to confirm the arbitration award and a motion for prejudgment and postjudgment interest in the Central District of California. The Central District of California granted Park Place's motion to confirm, denied the United States' motion to vacate, and denied Park Place's motion for prejudgment and postjudgment interest. The United States timely petitioned for review of both the district court's denial of its motion to vacate and the district court's granting of Park Place's motion to confirm. Park Place filed a cross-appeal challenging the denial of postjudgment interest.

## II.   OVERVIEW OF THE APPEAL

On appeal, the United States asserts that the Central District of California erred in denying its motion to vacate the arbitration award. *See* 9 U.S.C. § 10. In addition, the United States continues to argue that it has not waived its sovereign immunity to the confirmation of an arbitration award under the FAA and, therefore, the Central District of California lacked authority to grant Park Place's motion to confirm the award. *See* 9 U.S.C. § 9. In response, Park Place contends the Central District of California had jurisdiction to entertain the motion to confirm because the sovereign immunity question had already been resolved by the Federal Circuit and could not be re-raised in the district court. Park Place also appeals the district court's denial of its motion for postjudgment interest.

We review a district court's decision to confirm or vacate an arbitration award *de novo*. *See Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 879 (9th Cir. 2007); *Woods v. Saturn Distrib. Corp.*, 78 F.3d 424, 427 (9th Cir. 1996). We also review ques-

tions of sovereign immunity and subject matter jurisdiction *de novo*. *Clinton v. Babbitt*, 180 F.3d 1081, 1086 (9th Cir. 1999).

Because, as we explain, there are different jurisdictional bases for the motion to vacate and the motion to confirm, we first consider the United States' motion to vacate and then turn to Park Place's motion to confirm.

## III.   THE UNITED STATES' MOTION TO VACATE

Under the FAA, once a controversy has been arbitrated pursuant to a valid arbitration provision and the arbitrator has made an award, either party to the arbitration may file a motion to vacate an arbitration award. *See* 9 U.S.C. § 10. We consider first the jurisdictional grounds for entertaining the motion, and then turn to the merits of the request for vacatur.

### A.   *Jurisdiction*

[1] The FAA provides a means of judicial enforcement where a controversy has been arbitrated pursuant to a valid arbitration provision and the arbitrator has made an award. *See* 9 U.S.C. §§ 9, 10. However, the FAA does not itself confer jurisdiction on federal district courts over actions to compel arbitration or to confirm or vacate arbitration awards, *see* 9 U.S.C. § 4; *Garrett v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 882, 883-84 (9th Cir. 1993), nor does it create a federal cause of action giving rise to federal question jurisdiction under 28 U.S.C. § 1331. *See Kehr v. Smith Barney, Harris Upham & Co., Inc.*, 736 F.2d 1283, 1287 (9th Cir. 1984). As the Supreme Court has explained:

> The [FAA] is something of an anomaly in the field of federal-court jurisdiction. It creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate, yet it does not create any independent federal-question jurisdic-

tion. . . . [T]here must be diversity of citizenship or some other independent basis for federal jurisdiction.

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983); *see also Southland Corp. v. Keating*, 465 U.S. 1, 15 n.9 (1984). An action under the FAA is an action in contract to enforce the arbitration provision. *See Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989) (the FAA was created "to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and place such agreements upon the same footing as other contracts" (internal citations and quotations omitted)). Accordingly, as in any contract dispute, to be brought in federal court an action under the FAA must have an independent basis for jurisdiction. *See Luong v. Circuit City Stores, Inc.* 368 F.3d 1109, 1111 (9th Cir. 2004).[7]

**[2]** Section 1345 of Title 28 furnishes an independent basis for federal subject matter jurisdiction for "all civil actions, suits or proceedings commenced by the United States." 28 U.S.C. § 1345; *see United States v. Yakima Tribal Court*, 806 F.2d 853, 858 (9th Cir. 1986). Here, the United States commenced civil proceedings when it filed a complaint and motion to vacate the arbitration award in the Central District of California on October 8, 2004. *See* FED. R. CIV. P. 3. Section 1345 is sufficient to support the district court's jurisdiction over the motion to vacate even though the United States

---

[7]Typically, the diversity statute, 28 U.S.C. § 1332, supplies jurisdiction for actions under the FAA. *See Theis Research, Inc. v. Brown & Bain*, 400 F.3d 659, 662 (9th Cir. 2005); *Circuit City Stores, Inc. v. Najd*, 294 F.3d 1104, 1106 (9th Cir. 2002). The United States, however, is neither a state nor a citizen of a state, and may neither sue nor be sued under § 1332. *See* 28 U.S.C. § 1332(e); *State of Texas v. Interstate Commerce Comm'n*, 258 U.S. 158, 160 (1922); *United States v. Dry Dock Sav. Inst.*, 149 F.2d 917, 918 (2d. Cir. 1945) ("Obviously the United States is not a citizen of any state.").

did not initiate the arbitration proceedings that underlie the current action.[8]

[3] The FAA also enumerates orders from which an appeal may be taken. Although the denial of a motion to vacate an arbitration award is not one of the specified grounds for appeal,[9] the order falls within the catchall provision providing for appeal of "a final decision with respect to an arbitration that is subject to this title." 9 U.S.C. § 16(a)(3); *see Bridas*

---

[8]The United States filed a motion to vacate as a defensive measure, and its timing reflects the short statute of limitations governing such motions. Although a party seeking to confirm an arbitration award has *one year* to apply to a court for confirmation, *see* 9 U.S.C. § 9, "[n]otice of a motion to vacate . . . an award must be served . . . within *three months* after the award is filed or delivered," 9 U.S.C. § 12 (emphasis added). As sovereign, the United States is generally not subject to limitations periods, except "when Congress has expressly created one" such as in the FAA. *United States v. Thornburg*, 82 F.3d 886, 893 (9th Cir. 1996) (citing *Guaranty Trust Co. v. United States*, 304 U.S. 126, 133 (1938)). When the arbitration panel entered an award on July 9, 2004, that date triggered the statute of limitations periods for any motions to confirm or vacate under the FAA. The United States timely filed its notice of appeal.

[9]An appeal may be taken from—

    (1)   an order—

        (A) refusing a stay of any action under [9 U.S.C. § 3],

        (B) denying a petition under [9 U.S.C. § 4] to order arbitration to proceed,

        (C) denying an application under [9 U.S.C. § 206] to compel arbitration,

        (D) confirming or denying confirmation of an award or partial award, or

        (E) modifying, correcting, or vacating an award.

    (2)   an interlocutory order granting, continuing, or modifying an injunction against an arbitration that is subject to this title; or

    (3)   a final decision with respect to an arbitration that is subject to this title.

9 U.S.C. § 16(a).

*S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 353 (5th Cir. 2003). We have previously found such orders appealable. *See Fid. Fed. Bank, FSB v. Durga Ma Corp.*, 386 F.3d 1306, 1308 (9th Cir. 2004); *Sovak v. Chugai Pharm. Co.*, 280 F.3d 1266, 1271 (9th Cir. 2002). We thus have jurisdiction over the United States' appeal of the district court's order pursuant to 28 U.S.C. § 1291.

B.  *Merits*

[43] On appeal, the United States asserts that the district court erred in denying its motion to vacate under 9 U.S.C. § 10. Section 10 restricts the permissible grounds for vacatur to four specified circumstances. In relevant part, § 10 authorizes vacatur "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). We have strictly interpreted this standard, emphasizing that "review of the award itself is both limited and highly deferential." *PowerAgent Inc. v. Elec. Data Sys. Corp.*, 358 F.3d 1187, 1193 (9th Cir. 2004) (internal quotation marks omitted). As such, "arbitrators exceed their powers in this regard not when they merely interpret or apply the governing law incorrectly, but when the award is completely irrational, or exhibits a manifest disregard of law." *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 997 (9th Cir. 2003) (internal quotation marks and citations omitted). This means that " '[i]t must be clear from the record that the arbitrators recognized the applicable law and then ignored it. As such, mere allegations of error are insufficient.' " *Collins*, 505 F.3d at 879 (quoting *Carter v. Health Net of Cal., Inc.*, 374 F.3d 830, 838 (9th Cir. 2004)).

The United States offers three independent reasons why the arbitration award was in manifest disregard of the law and thus warrants vacatur. First, the United States contends that Park Place waived any right to arbitrate claims against the United States by abandoning its 1997 arbitration demand in

favor of litigation. Second, the United States argues that the arbitration panel should have applied the California rather than the federal statute of limitations. Third, the United States asserts that California partnership law precludes the enforcement of an arbitration award against a general partner where creditors have not first attempted to collect against the partnership. We consider each argument in turn.

### 1.   Waiver of Right to Arbitrate

The United States first contends that the award was in manifest disregard of the law because Park Place waived its right to arbitration under the JVA. The United States raised the waiver issue before the arbitration panel in its response to Park Place's arbitration demand and before the district court in its motion to vacate. The panel rejected the United States' argument without explanation and the district court held it need not revisit the issue. Although the United States asserts that waiver is a question for courts, not arbitrators, we need not address this question because no matter the appropriate decision-maker, our review under 9 U.S.C. § 10 is the same. Because the United States now raises this argument as part of its motion to vacate, we review the arbitration award for whether it exhibits a manifest disregard of the law of waiver.

**[5]** The right to arbitration, like any other contract right, can be waived. *See Van Ness Townhouses v. Mar Indus. Corp.*, 862 F.2d 754, 758-59 (9th Cir. 1988). However, we have emphasized that "waiver of the right to arbitration is disfavored because it is a contractual right, and thus 'any party arguing waiver of arbitration bears a heavy burden of proof.' " *Id.* at 758 (quoting *Belke v. Merrill Lynch, Pierce, Fenner & Smith*, 693 F.2d 1023, 1025 (11th Cir. 1982)). To demonstrate waiver of the right to arbitrate, a party must show: "(1) knowledge of an existing right to compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing arbitration resulting from such inconsistent acts." *Fisher v. A.G. Becker Paribas Inc.*, 791

F.2d 691, 694 (9th Cir. 1986).[10] The United States cannot satisfy the second or third *Fisher* requirements. We find no evidence that Park Place abandoned its right to arbitrate. Park Place first sought arbitration in 1997 in Florida. The United States opposed that effort and prevailed in part. Park Place subsequently asked the AAA to hold the matter in abeyance to pursue suit, first in California and then in the Court of Federal Claims. It then renewed its arbitration demand in 2003. As the United States knows well, Park Place has vigorously pursued its remedies, and the United States has just as vigorously resisted its efforts at every step. Park Place has not abandoned its arbitration rights; it has only moved the battle from one venue to another.

[6] In any event, the United States has not shown it has been prejudiced by the delay. Its sole assertion of prejudice rests on an observation by the Court of Federal Claims, of "the extreme burdens of discovery, which were disproportionately imposed on [the United States]." This statement, made when considering Park Place's motion to stay litigation pending arbitration, is insufficient to establish prejudice. *See, e.g.*, *Fisher*, 791 F.2d at 697 (holding that even extensive discovery into both arbitrable and non-arbitrable claims before mov-

---

[10]Waiver of a right is distinct from forfeiture of a right. As we have explained, "[w]aiver is 'the intentional relinquishment or abandonment of a known right,' whereas forfeiture is 'the failure to make the timely assertion of [that] right.' " *United States v. Jacobo Castillo*, 496 F.3d 947, 952 n.1 (9th Cir. 2007) (en banc) (alteration in original) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)).

Park Place asserts that a waiver argument may not be raised *after* an arbitration award has been entered. We do not find any such limitation in the FAA. Although § 10 does not specifically refer to waiver as grounds for vacatur, it does not discuss *any* specific legal grounds for vacatur. Instead, its general language encompasses any way in which "the arbitrators exceeded their powers." 9 U.S.C. § 10(a)(4). Presumably an arbitration panel exceeds its power by entering an award in manifest disregard of law where the prevailing party plainly waived its right to arbitration in a way that prejudiced an opposing party.

ing to compel arbitration is insufficient prejudice for a waiver if that discovery is available for trial of the non-arbitrable claim in federal district court). Moreover, the costs of discovery referred to by the Court of Federal Claims were sunk costs, not marginal costs, and have no bearing on the prejudice the United States would suffer by proceeding through arbitration. It is far from clear that the arbitration panel was wrong, much less that the award exhibits a manifest disregard of law. In light of the deference we afford the arbitrators, we decline to accept this basis for vacatur.

### 2.   Statute of Limitations

The United States also contends that the arbitration panel erred in applying the six-year federal statute of limitations from the Tucker Act, *see* 28 U.S.C. § 2501, rather than the four-year limitations period for California breach of contract actions, *see* CAL. CIV. PROC. § 337, and erred in tolling the limitations period pending the Court of Federal Claims suit. The United States asserts that, consistent with the Federal Circuit's holdings, because the United States was "standing in the shoes of" the former general partner of LCP, it should be subjected to the California statute of limitations, like any other private party.

[7] The United States' argument has no merit, and certainly cannot meet the higher threshold of establishing that the award exhibits a manifest disregard of the law. In the case of an action brought under the Federal Tort Claims Act ("FTCA"), we have long recognized that "[a] court must look to state law for the purpose of defining the actionable wrong for which the United States shall be liable, but to federal law for the limitations of time within which the action must be brought." *Poindexter v. United States*, 647 F.2d 34, 36 (9th Cir. 1981); *see also United States v. Kubrick*, 444 U.S. 111, 117-18 (1979) (applying the FTCA statute of limitations). The Court of Federal Claims has reached the same conclusion as to actions brought pursuant to the Tucker Act. *Richmond,*

*Fredericksburg & Potomac R.R. Co. v. United States*, 27 Fed. Cl. 275, 287, 289 (1992) (applying Tucker Act statute of limitations although Virginia law governed claims). Despite the United States' contention that such a result is unfair where the statutes of limitations differ, we have emphasized that the federal statute of limitations governs "even when the state period of limitations is longer or shorter." *Poindexter*, 647 F.2d at 36. Because the statute of limitations period of the Tucker Act is an express condition on the United States' waiver of sovereign immunity, courts should neither extend nor narrow that waiver beyond that which Congress intended. *Cf. Kubrick*, 444 U.S. at 117-18.

**[8]** The United States also argues that, even if the arbitration panel correctly applied the six-year federal statute of limitations, the panel erroneously calculated the limitations period as beginning on October 26, 1999, the date Park Place filed suit in the Court of Federal Claims. Measuring from that date, the arbitration panel found that because all alleged breaches occurred after October 26, 1993, the arbitration action was timely. Relying on California law, the United States asserts that it was "absurd" to use that date, and that the arbitration panel should have calculated the limitations period as triggered by the filing of the arbitration demand, not the start of litigation. We offer no view as to whether the arbitration panel is correct. We can conclude that the date the panel chose has a reasonable basis in common sense and that the award did not manifestly disregard the law.

3.  California Partnership Law

Lastly, the United States argues that California partnership law precludes enforcing an arbitration award against a general partner where creditors have not first attempted to collect against the partnership. To support this proposition, the United States cites California Corporations Code § 16307(d), which prohibits "[a] judgment creditor of a partner" from "levy[ing] execution against the assets of [a] partner." We

think there is a simple response to this, however, as this provision is inapplicable where recovery is sought by a partner.

**[9]** "Under California law, partners are permitted to 'maintain an action against the partnership or another partner for legal or equitable relief.' " *Schnabel v. Lui*, 302 F.3d 1023, 1030 (9th Cir. 2002) (quoting CAL. CORP. CODE § 16405(b)); *see also Tyrone v. Kelley*, 507 P.2d 65, 74 (Cal. 1973). The Federal Circuit noted this proposition in *Hardie I*, when it allowed Park Place to sue the government under the JVA. *See* 19 F. App'x at 903 ("Under the law of California, which indisputably governs the [JVA], the general partner of a partnership is directly liable for the partnership's debts." (citing CAL. CORP. CODE §§ 15509(1), 16306)). The statute cited by the United States, California Corporations Code § 16307(d), concerns recovery by "a judgment creditor of a partner." The recovery here was sought by a partner directly, not its creditor. Indeed, California Corporations Code § 16307(d) falls within the article of the Code concerning "Relations of Partners to Persons Dealing with Partnerships" and is inapt to this situation. By contrast, the appropriate provision, California Corporations Code § 16405(b), is contained within the article entitled "Relations of Partners to Each Other and to Partnership." The award does not exhibit manifest disregard of California partnership law.

\* \* \* \* \*

**[10]** The United States has not established that "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). Consequently, we affirm the district court's denial of the United States' motion to vacate.

## IV. PARK PLACE'S MOTION TO CONFIRM

Having concluded that there are no grounds for vacating the award, we turn to the more difficult question of whether

it may be confirmed. The government contends that it may not because the United States has not waived its sovereign immunity to confirmation in the Central District of California. Park Place argues that the same court that the United States invited to vacate the arbitration award must be able to confirm it as well. As the history of this case amply demonstrates, nothing is going to be simple, but in the end we agree with the United States.

A.    *The Relationship Between Sovereign Immunity and Subject Matter Jurisdiction*

This case presents questions of both sovereign immunity and subject matter jurisdiction. There is a complex relationship between these two subjects. We have occasionally "mistakenly equate[d] sovereign immunity with lack of subject matter jurisdiction." *Powelson v. United States*, 150 F.3d 1103, 1104 (9th Cir. 1998) ("*Powelson II*"). Although the concepts are related, sovereign immunity and subject matter jurisdiction present distinct issues. *See Arford v. United States,* 934 F.2d 229, 231 (9th Cir. 1991).

**[11]** A waiver of sovereign immunity means the United States is amenable to suit in a court properly possessing jurisdiction; it does not guarantee a forum. *See Alvarado v. Table Mountain Rancheria*, 509 F.3d 1008, 1016 (9th Cir. 2007) ("To confer subject matter jurisdiction in an action against a sovereign, in addition to a waiver of sovereign immunity, there must be statutory authority vesting a district court with subject matter jurisdiction."). For example, both the Suits in Admiralty Act ("SAA"), 46 U.S.C. § 741 *et seq.*, and the Public Vessels Act ("PVA"), 46 U.S.C. § 781 *et seq.*, waive the United States' sovereign immunity, with the latter even explicitly providing for damages. *See* 46 U.S.C. §§ 30903, 31102. However neither statute contains a jurisdiction-conferring provision. Instead, subject matter jurisdiction over actions arising under these Acts may be founded on 28 U.S.C. § 1333.

**[12]** Conversely, the mere existence of a forum does not waive sovereign immunity. As we observed in *Powelson II*, "[a] statute may create subject matter jurisdiction yet not waive sovereign immunity." 150 F.3d at 1105; *see also Arford*, 934 F.2d at 231 (holding that 28 U.S.C. § 1340 created subject matter jurisdiction, but "[did] not constitute a waiver of sovereign immunity."). For example, 28 U.S.C. § 1331 grants district courts original jurisdiction over "all civil actions arising under the Constitution, laws or treaties of the United States," but it does not waive sovereign immunity. *See Hughes v. United States*, 953 F.2d 531, 539 n.5 (9th Cir. 1992). As we have observed, " '[section 1331] cannot be construed as authorizing suits of this character against the United States, else the exemption of sovereign immunity would become meaningless.' " *Dunn & Black, P.S. v. United States*, 492 F.3d 1084, 1088 n.3 (9th Cir. 2007) (quoting *Geurkink Farms, Inc. v. United States*, 452 F.2d 643, 644 (7th Cir. 1971)).

We have occasionally treated jurisdiction and sovereign immunity as though they were the same inquiry. *See, e.g.*, *Powelson v. United States,* 979 F.2d 141, 145 (9th Cir. 1992) ("*Powelson I*"). Any imprecision in our language may be due to the fact that the two most important waivers of sovereign immunity for damages are the FTCA, 28 U.S.C. § 2671 *et seq*., for torts committed by government employees acting in the scope of their employment, and the Tucker Act, 28 U.S.C. §1491, for actions sounding in contract. Both of these acts contain an independent conferral of jurisdiction. 28 U.S.C. § 1346(b)(1) ("[T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages [based on tort]"); 28 U.S.C. § 1346(a)(2) ("The district courts shall have original jurisdiction . . . of . . . [a]ny civil action against the United States [for damages sounding in contract]"); *see also* GREGORY C. SISK, LITIGATION WITH THE FEDERAL GOVERNMENT §§ 3.02, 3.04(b), 4.02(b), 4.04(a) (4th ed. 2006).

B.    *Sovereign Immunity and Subject Matter Jurisdiction in this Case*

We are going to use sovereign immunity to frame our analysis in this case. Because sovereign immunity and subject matter jurisdiction are so closely linked in suits against the government, we will inevitably address subject matter jurisdiction as well. There is some path dependence in our methodology: the theory of sovereign immunity under which a court entertains a suit for money damages against the government may limit, or perhaps even determine, the venues in which there is subject matter jurisdiction.

As the party asserting a claim against the United States, Park Place has the burden of "demonstrating an unequivocal waiver of immunity." *Cunningham v. United States*, 786 F.2d 1445, 1446 (9th Cir. 1986). Park Place makes four arguments in support of its claim that sovereign immunity does not bar its motion to confirm in the Central District of California: (1) the Federal Circuit's earlier decisions in *Hardie I* and *Hardie II* held that the United States waived its sovereign immunity when it assumed ownership of LCP's interests, and the United States thus may not contest the issue of sovereign immunity; (2) independent of the *Hardie* decisions, the United States specially waived its immunity by assenting to the JVA and its arbitration clause; (3) Congress waived the United States' immunity to this action under § 702 of the Administrative Procedure Act; and (4) the United States waived its sovereign immunity to a motion to confirm when it filed its motion to vacate. We consider each argument in turn. We conclude that the Tucker Act is the only means by which the United States can be said to have waived its sovereign immunity in this case and that the district court did not have jurisdiction under the Tucker Act.

### 1. The *Hardie I* and *II* Decisions

Park Place principally relies on the decisions by the Federal Circuit in *Hardie I* and *Hardie II* to support its claim of waiver. The Federal Circuit's decisions, to the extent applicable, govern as law of the case.[11] The law of the case doctrine, which posits that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case," *Arizona v. California*, 460 U.S. 605, 618 (1983), applies equally to decisions of coordinate appellate courts. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988); *Jeffries v. Wood*, 114 F.3d 1484, 1488-89 (9th Cir. 1997) (en banc) ("Law of the case is a jurisprudential doctrine under which an appellate court does not reconsider matters resolved on a prior

---

[11]The Central District of California characterized the binding effect of the Federal Circuit's holding as collateral estoppel. We think, however, that the doctrine of collateral estoppel is inapplicable here, and the more appropriate doctrine is law of the case. The doctrine of collateral estoppel, or issue preclusion, provides that "once a court decides an issue of fact or law necessary to its judgment, that decision precludes relitigation of the same issue on a different cause of action between the same parties." *Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 466 n.6 (1982).

Here, neither of the Federal Circuit's determinations meets the requirements for estoppel. "To be given preclusive effect, a judgment must be a final adjudication of the rights of the parties and must dispose of the litigation on the merits." *Media Techs. Licensing, LLC v. Upper Deck Co.*, 334 F.3d 1366, 1369 (Fed Cir. 2003). The Federal Circuit did not render final judgment on Park Place's claims. In *Hardie I*, the Federal Circuit reversed the Court of Federal Claims' dismissal of Park Place's breach of contract claim against the United States for lack of subject matter jurisdiction, and remanded for further consideration on the merits. *See* 19 F. App'x at 903. In *Hardie II*, the Federal Circuit dismissed for lack of jurisdiction the United States' appeal of an order by the Court of Federal Claims denying its motion to enjoin the arbitration proceeding in Los Angeles, California. *See* 367 F.3d at 1289, 1291. Although the Federal Circuit discussed and preliminarily resolved issues of sovereign immunity to suit and arbitration, it did not render a final judgment. Indeed, because the claim before us is the identical claim addressed by the Federal Circuit—pursued in an arbitration demand in Los Angeles, California, rather than continued as litigation in the Court of Federal Claims—that court's earlier resolution cannot have constituted a final judgment.

appeal."). For a prior ruling to become law of the case as to a particular issue, that issue "must have been decided explicitly or by necessary implication in the previous disposition." *Herrington v. County of Sonoma*, 12 F.3d 901, 904 (9th Cir. 1993) (internal quotation marks and alteration omitted).

Park Place claims that the Federal Circuit's decisions in *Hardie I* and *Hardie II* are law of the case and waive the sovereign immunity of the United States not only in the Court of Federal Claims but in the district courts as well. We disagree. A fair reading of those decisions reveals that the Federal Circuit's conclusions necessarily relied upon the Tucker Act as the basis for the waiver of sovereign immunity.

In *Hardie I*, Park Place filed suit in the Court of Federal Claims against the United States for breach of the JVA, claiming that the court had jurisdiction over the suit under the Tucker Act. The Court of Federal Claims dismissed the suit because there was no privity between Park Place and the United States and thus "no contract upon which a Tucker Act claim may lie." 19 F. App'x at 901.

The Federal Circuit reversed the decision of the Court of Federal Claims. The Federal Circuit found that there was no bright-line rule for determining privity. "Instead, . . . this court has recognized Tucker Act jurisdiction over contract-based claims where there is no literal contract between the plaintiff and the United States." *Id.* at 905. The court explained that the "privity issue in this case presents a consideration typically absent" in cases before the court. *Id.* In the usual case, the United States enters into an arrangement with a prime contractor and a subcontractor brings suit, claiming it has stepped into the prime's shoes. Here, the United States was not a principal to the contract. Instead, "the United States ha[d] elected to step into the shoes of the general partner of LCP. . . . The United States was not compelled to become the general partner of LCP; instead, it chose to do so." *Id.* at 905-06. The Federal Circuit concluded as follows: "In short, in

appropriate circumstances such as these, Tucker Act jurisdiction over contract-based claims extends beyond those alleging breach of a contract to which both the plaintiff and the United States are named parties." *Id.* at 906.

In *Hardie II*, the Federal Circuit again considered sovereign immunity and jurisdiction over Park Place's claims, this time in the arbitration context. After *Hardie I*, Park Place had shifted its focus from litigation to arbitration by filing an arbitration demand in Los Angeles. In *Hardie II*, the Federal Circuit considered an order by the Court of Federal Claims refusing to enjoin that arbitration proceeding. *See* 367 F.3d at 1289. The Federal Circuit rejected the United States' position that it was not subject to binding arbitration, reasoning that it had already decided "that arbitration is a 'contractual arrangement' and that the United States is bound by the contractual arrangements contained within the joint venture agreement." *Id.* at 1291. The Federal Circuit then concluded that the United States' consent to arbitration was not independent of its "waiver of sovereign immunity as to the breach of contract claims," *id.*, and noted that it had previously ruled in *Hardie I* that the Court of Federal Claims "had jurisdiction under the Tucker Act to adjudicate [Park Place's] contract claim." *Id.* at 1289.

Park Place relies heavily on the Federal Circuit's declaration in *Hardie I* that the United States had "step[ped] into the shoes of the general partner of LCP," and the court's later statement in *Hardie II* that "the United States is subject to the arbitration clause of the joint venture agreement just as any private party would be," 367 F.3d at 1291. When these statements are read in context, however, it is clear that the Federal Circuit was simply concerned with whether the United States was in privity of contract with Park Place. Answering that question in the affirmative, the Federal Circuit held that Park Place could bring an action under the Tucker Act on the contract. In other words, because there was a contract to which the United States was a party, Congress had waived its sover-

eign immunity in the Tucker Act for suits on the contract brought in the Court of Federal Claims.

**[13]** The fact that Park Place pled the Tucker Act, the Court of Federal Claims dismissed for want of jurisdiction under the Tucker Act, and the Federal Circuit framed its discussion in terms of the Tucker Act is critical to understanding *Hardie I* and *Hardie II*. The "step into the shoes" metaphor on which Park Place relies is not a free-standing principle that the United States was to be treated, literally, as a private entity. Indeed, if the Federal Circuit had in fact intended this meaning, it would have simply affirmed the Court of Federal Claims' original decision in *Hardie I*, but on the ground that the Court of Federal Claims has no jurisdiction over contract disputes between private parties. Rather, the Federal Circuit used the metaphor to explain why Park Place could bring a suit sounding in contract against the United States when the United States was not a signatory to the contract.

Park Place's theory of the Federal Circuit's decisions in *Hardie I* and *Hardie II* also makes little sense for another, related reason. To establish the United States' potential liability under the JVA, the Federal Circuit needed only to find that the United States was in privity of contract with LCP, since the Tucker Act straightforwardly waived the United States' sovereign immunity if privity were found to exist. Under Park Place's theory, however, the Federal Circuit did not simply decide that the United States was in privity of contract with Park Place and hence that Park Place could maintain an action under the Tucker Act in the Court of Federal Claims. Rather, Park Place would have us believe that, without citing any statutory authority besides the Tucker Act, the Federal Circuit broadly held the United States' sovereign immunity waived in the district courts as well, even though such a holding was in no sense necessary to its resolution of the case before it. We may not treat sovereign immunity so cavalierly; certainly, the Federal Circuit did not.

**[14]** For the same reasons the Federal Circuit found that the Tucker Act was a proper source of jurisdiction for Park Place's claims in the Court of Federal Claims, it cannot be the basis for jurisdiction in the Central District of California. The Court of Federal Claims possesses exclusive jurisdiction of claims arising under the Tucker Act in excess of $10,000, *see* 28 U.S.C. § 1491(a)(1); *Wilkins v. United States*, 279 F.3d 782, 785 (9th Cir. 2002), and Park Place's contract claims were properly before that court.[12] The Tucker Act supplies both a basis for the exercise of subject matter jurisdiction and a concomitant waiver of sovereign immunity in the Court of Federal Claims. This is a package deal—the waiver of sovereign immunity is coextensive with the jurisdiction the statute confers. The Tucker Act thus neither waives sovereign immunity for suit in, nor confers jurisdiction on, the Central District of California.

A separate provision, the so-called Little Tucker Act, confers concurrent jurisdiction in the district courts for certain contract claims against the United States, but the Little Tucker Act's jurisdictional grant is limited to claims for money damages "not exceeding $10,000 in amount." *See* 28 U.S.C. § 1346(a)(2). Parties may waive their right to receive more

---

[12]Although we are tempted to state, as we have on occasion, that the Court of Federal Claims has exclusive jurisdiction over contract claims against the United States, *see Skokomish Indian Tribe v. United States*, 410 F.3d 506, 511 (9th Cir. 2005) (en banc); *M-S-R Pub. Power Agency v. Bonneville Power Admin.*, 297 F.3d 833, 840 (9th Cir. 2002); *Wilkins v. United States*, 279 F.3d 782, 785 (9th Cir. 2002), the Supreme Court has explained that the Court of Federal Claims does not possess "exclusive jurisdiction of Tucker Act claims for more than $10,000 . . . . Rather, that court's jurisdiction is 'exclusive' only to the extent Congress has not granted any other court authority to hear the claims that may be decided by the [Court of Federal Claims]." *Bowen v. Massachusetts*, 487 U.S. 879, 910 n.48 (1988). We think it is more precise to state that the Tucker Act exclusively grants jurisdiction to the Court of Federal Claims, but that court's jurisdiction is concurrent to the extent that, in another act, Congress has both waived sovereign immunity over a contract claim and created jurisdiction in another court.

than $10,000 in order to satisfy the Little Tucker Act and obtain jurisdiction in the district court. *See Marceau v. Blackfeet Hous. Auth.*, 455 F.3d 974, 986 (9th Cir. 2006), *readopted on reh'g*, 540 F.3d 916, 929 (9th Cir. 2008); *United States v. Johnson*, 153 F.2d 846, 848 (9th Cir. 1946). The Little Tucker Act, however, cannot supply the proper basis for the district court's jurisdiction—as Park Place acknowledges—because Park Place has not waived its claims in excess of $10,000. *See* 28 U.S.C. § 1346(a)(2).

**[15]** Thus, after *Hardie I* and *Hardie II*, the United States may have waived its sovereign immunity to the arbitration under the JVA, but the basis for that waiver, the Tucker Act, conditions its waiver on jurisdiction to the Court of Federal Claims. Or, to put it differently, the Tucker Act has not waived the sovereign immunity of the United States to suit in the Central District of California, and accordingly, to the extent Park Place relies on the Tucker Act for its waiver of sovereign immunity, that court lacked authority to confirm the arbitration award.

## 2. The JVA as a Special Waiver

Park Place alternatively contends that the United States specially waived its sovereign immunity to confirmation of the arbitration award by entering into the JVA. The district court accepted this alternate theory. The court observed that the JVA provides that disputes arising thereunder "shall be determined and settled by arbitration . . . pursuant to the rules of the [AAA]" and that any arbitration award could be entered "in any court of competent jurisdiction in the State of California."

The district court found support for its position in *C & L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 532 U.S. 411 (2001), but that decision has nothing to do with either the United States or the Tucker Act. In *C&L*, a private party contracted with an Indian tribe, and the parties

contractually agreed to arbitrate any disputes arising thereunder. *See id.* at 414-16. The Supreme Court noted that the tribe had sovereign immunity—"even for breach of contract involving off-reservation commercial conduct—unless Congress has authorized the suit or the tribe has waived its immunity." *Id.* at 414 (internal quotation marks omitted). The Court held that the tribe had waived that immunity "by the clear import of the arbitration clause," and was therefore "amenable to a state-court suit to enforce an arbitral award." *Id.*

**[16]** Although *C & L* shares some facts with the present case—both involve an arbitration award against an otherwise-sovereign entity—it is inapposite. The issue in *C & L* was whether the Indian tribe had waived its sovereign immunity to suit based on contract. We need not consider this question here insofar as the issue relates to contract: the Tucker Act waives the sovereign immunity of the United States for such suits, and the Federal Circuit has determined that the United States is a party to the contract here, the JVA. To the extent Park Place seeks to enforce the JVA, the United States is thus subject to suit under the Tucker Act. The relevant question is *where* such a suit could be brought. Congress has specified that for suits in excess of $10,000, jurisdiction is only proper in the Court of Federal Claims.[13] We therefore cannot accept

---

[13]We leave for another day interesting questions regarding the scope of the government's authority to abrogate sovereign immunity by contract in situations and fora not covered by the Tucker Act. For purposes of this case, it suffices to note two related points.

First, although we accept the Federal Circuit's conclusion that the United States is bound by the arbitration clause for purposes of the Tucker Act, there is no evidence that the United States has waived its sovereign immunity outside the confines of that Act. Any such waiver must be unequivocal, *see Dep't of Energy v. Ohio*, 503 U.S. 607, 615 (1992), and the United States was not a party to the original JVA. Park Place has not pointed us to any other law or agreement that waives the sovereign immunity of the United States for contracts or arbitrations in this case.

Second, the Attorney General has charge of litigation in which the United States is an interested party. *See* 28 U.S.C. §§ 516, 519. As part of

Park Place's theory that the JVA constitutes a waiver to confirmation in the Central District of California.[14]

## 3.    The APA Waiver

**[17]** Alternatively, Park Place asserts that Congress waived the United States' immunity to confirmation through the Administrative Procedure Act, 5 U.S.C. § 702.[15] Section 702 provides as follows:

---

his authority to direct litigation, the Attorney General may compromise claims by settlement or arbitration. *See Constitutional Limitations on Federal Government Participation in Binding Arbitration*, 19 U.S. Op. Off. Legal Counsel 208, 209 & n.3 (1995). The government may expressly enter into binding arbitration "assuming the availability of authority to effect any remedy that might result from the arbitration." *Id.* at 232 & n.4. However, although there are procedures by which the Attorney General may consent to binding arbitration on behalf of the United States, those procedures have plainly not been followed here. *See Developing Guidance for Binding Arbitration: A Handbook for Federal Agencies*, 65 Fed. Reg. 50,005 (Aug. 16, 2000). Thus, even assuming his authority to do so, we cannot see that the Attorney General has somehow consented to confirmation in the Central District of California simply because the United States assumed LCP's position in the JVA.

[14]Section 5.03 of the JVA not only provides for binding arbitration, but it specifies that the arbitration shall be conducted in Los Angeles and that judgment on any award "may be entered thereon in any court of competent jurisdiction in the State of California." The forum-selection clause—agreed to by Park Place and LCP before the United States was deemed a party to the contract—is, at best, consent to personal jurisdiction and venue. *See Dow Chem. Co. v. Calderon*, 422 F.3d 827, 831 (9th Cir. 2005). The clause cannot confer subject matter jurisdiction on California courts, federal or state.

[15]Section 702 waives sovereign immunity; however, it does not confer federal jurisdiction. *See, e.g.*, *Califano v. Sanders*, 430 U.S. 99, 107 (1977) ("[T]he APA does not afford an implied grant of subject-matter jurisdiction permitting federal judicial review of agency action."); *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645 (9th Cir. 1998) ("It is beyond question . . . that the APA does not provide an independent basis for subject matter jurisdiction in the district courts."); *Presbyterian Church v. United States*, 870 F.2d 518, 524 (9th Cir. 1989); *S. Delta Water Agency v. United States*, 767 F.2d 531, 535 (9th Cir. 1985) ("Congress's waiver of sovereign immunity [in 5 U.S.C. § 702] does not by itself confer jurisdiction.").

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States . . . .

5 U.S.C. § 702. In order for the APA's waiver to apply to Park Place's motion to confirm, three conditions must all be met: (1) Park Place's claim must not seek "money damages"; (2) an adequate remedy for its claims must not be available elsewhere; and (3) Park Place's claims must not seek relief expressly or impliedly forbidden by another statute. *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 645 (9th Cir. 1998). In this case, Park Place plainly cannot meet either the first or third conditions for § 702 waiver.

With regard to the first condition, in *Bowen v. Massachusetts*, 487 U.S. 879 (1988), the Supreme Court cautioned that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.' " *Id.* at 893. The *Bowen* Court further explained this point as follows:

Our cases have long recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief—which may include an order providing for the reinstatement of an employee with backpay, or for the recovery of specific property or monies, eject-

ment from land, or injunction either directing or restraining the defendant officer's actions.

*Id.* (internal quotation marks, emphasis, and citation omitted). The Court continued on, explaining that "money damages . . . normally refers to a sum of money used as compensatory relief" and that "[d]amages are given . . . to substitute for a suffered loss, whereas specific remedies are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." *Id.* at 895 (internal quotation marks and emphasis omitted).

**[18]** The issue presented by Park Place's motion to confirm then, is this: Is the $93,612,892 awarded by the arbitration panel specific relief, the very thing to which Park Place was entitled under the JVA; or is it damages, a substitute remedy compensating Park Place for losses suffered as a result of the alleged breaching conduct of the United States? We think the answer is clearly the latter. Park Place's arbitration demand was based upon its claims before the Court of Federal Claims and the arbitration panel justified its decision by reasoning that "[a]s a result of the [United States'] breaching conduct, [Park Place] suffered, and continue[s] to suffer, significant diminution of [its] partnership distributions." The arbitration award is "relief that substitutes for that which ought to have been done" in that it compensates Park Place for the United States' mismanagement of the Club during its eight-year management period, as found by the arbitration panel.

Resisting this conclusion, Park Place points out that the *Bowen* Court noted that specific relief can encompass "the recovery of specific property *or monies*," 487 U.S. at 893 (emphasis in original), and argues that it simply seeks the specific sum of money set forth in the arbitration panel's decision and authorized by the JVA. This argument is unavailing. The entire point of specific relief is that it is relief that the plaintiff would be owed *even if the defendant had never engaged in wrongful conduct*. This is why the Supreme Court contrasted

specific relief with *compensatory* relief, or relief that substitutes for that which ought to have been done. The *Bowen* Court did acknowledge that specific relief can encompass money, but the examples the Court cited—such as a contract to lend money or a promise to pay a money bonus under a royalty contract, *see* 487 U.S. at 895—further illustrate that Park Place's argument is untenable. The JVA was not a contract for the payment of money. What Park Place was entitled to under the contract was a managing partner that did not grossly mismanage its business. The arbitration award was compensation, or a substitute, for the United States' alleged failure to meet that standard. Accordingly, Park Place cannot meet the first requirement for a waiver of sovereign immunity under § 702.

The conclusion that Park Place seeks money damages by itself requires us to reject its contention that Congress waived the United States' immunity to confirmation through the APA. However, even if confirmation of the arbitration award could be framed as involving something other than an award of money damages, this action would nonetheless be barred by the Tucker Act.

Section 702 makes clear that it does not confer "authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." The Tucker Act provides that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). Accordingly, we have consistently held that, while the Tucker Act precludes interpreting the APA as a waiver of sovereign immunity for *contract-based* claims in the district courts, the Tucker Act does not strip the district courts of jurisdiction in cases that "rest[ ] at bottom on statutory rights." *N. Side Lumber Co. v. Block*, 753 F.2d 1482, 1485 (9th Cir. 1985). Whether a claim is contractually or statutorily based depends upon the "source of the rights upon

which the plaintiff bases its claim." *N. Star Alaska v. United States*, 14 F.3d 36, 37 (9th Cir. 1994) (internal quotation marks omitted).

**[19]** Based on these established principles, we conclude that Park Place's action to confirm is a contract-based claim impliedly barred by the Tucker Act. As the Court of Federal Claims correctly noted, "[e]ntering judgment on an arbitration award is tantamount to granting a request for specific performance of the JVA." *See also Lafarge Conseils Et Etudes, S.A. v. Kaiser Cement & Gypsum Corp.*, 791 F.2d 1334, 1340 (9th Cir. 1986) (noting that motions to vacate and confirm arbitration awards arise directly out of contract). We have no doubt that a suit seeking specific performance of a contract is a "contractually" based claim for purposes of the APA and the Tucker Act.

Park Place nonetheless suggests that the motion to confirm is based on its statutory rights under 9 U.S.C. § 9, which provides, *inter alia*, that "any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." We disagree.

The Supreme Court has made very clear that the FAA was enacted in order to facilitate judicial enforcement of contracts and that an action under the FAA is simply an action to enforce the arbitration provision of the parties' contract. *See Volt Info. Scis., Inc.*, 489 U.S. at 474 (the FAA was created "to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and place such agreements upon the same footing as other contracts" (internal quotation marks and citation omitted)). The FAA "does not impose" any independent "substantive dut[ies]" upon the United States. *Tucson Airport Auth.*, 136 F.3d at 647. Indeed, the mere existence of an arbitration award against the federal government has neither legal significance nor creates any rights in favor of Park

Place absent a contractual provision binding the United States to the arbitration award. Thus, Park Place's claim clearly does "not exist independent of the . . . [c]ontract." *Id.* The fact that a statute gives us general authority to enforce contractual provisions regarding arbitration (without mentioning the United States specifically) does not mean that a plaintiff's suit is not based solely on rights created by the contract.

Indeed, we rejected an argument materially indistinguishable from the one Park Place makes here in *Tucson Airport Authority*. In that case, the plaintiff's predecessor in interest modified various aircraft for the United States military under a "Modification Center Contract." *Id.* at 643. The contract provided that, upon its termination, the United States would assume all obligations that the plaintiff had undertaken in good faith in connection with its work for the military. *Id.* The United States nonetheless refused to assume the plaintiff's defense in four separate civil suits filed against it. *Id.* On appeal to this court, the plaintiff contended that the government's refusal violated the Contract Settlement Act ("CSA"), 41 U.S.C. § 101 *et seq.*, and hence that its claim was not contractually based.

The CSA stated that war contracts "shall not be reopened, annulled, modified, set aside, or disregarded by any officer, employee, or agent of the United States," 41 U.S.C. § 103(m), while the FAA declares that courts should confirm arbitration awards "unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9. Thus, both statutes set forth a mechanism for the enforcement of contracts but do not create any statutory rights distinct from the terms of any contract entered into by the parties. We thus rejected the plaintiff's claim that it merely sought to enforce "statutory" rights under the CSA:

> General Dynamics's CSA claims do not exist independent of the Modification Center Contract. The CSA does not impose a substantive duty on the

United States to defend these claims. That duty, if it exists, derives from the contract. Moreover, General Dynamics seeks specific performance of the contract. The conclusion follows that these claims are contractually-based.

136 F.3d at 647. Similarly here, the FAA does not impose a substantive duty on the United States to participate in arbitration or abide by an arbitration award. That duty, if it exists, derives from the contract. Moreover, just like the plaintiff in *Tucson Airport Authority*, Park Place seeks specific performance of the contract.

**[20]** We express no opinion on whether Park Place has an adequate remedy elsewhere. Because Park Place's motion to confirm seeks both money damages and enforcement of contractual rights, the APA's limited waiver is inapplicable here.

4. Waiver Through Filing of the Motion to Vacate

Finally, Park Place argues that the United States waived its immunity to confirmation when it moved to vacate the arbitration award. Park Place suggests that the district court had jurisdiction over the United States' motion to vacate under 28 U.S.C. § 1345, and that its motion to confirm was so related to the motion to vacate that the district court acquired jurisdiction under either § 1345 or the supplemental jurisdiction statute, 28 U.S.C. § 1367. Neither statute will support Park Place's claim to a waiver of sovereign immunity.

**[21]** By its terms, § 1345 encompasses only actions "commenced *by* the United States." 28 U.S.C. § 1345 (emphasis added). We have explicitly rejected the proposition that "§ 1345 [may] establish[ ] jurisdiction for a suit *against* the United States, by drawing its essence from a separate action previously commenced *by* the United States." *Fid. & Cas. Co. v. Reserve Ins. Co.*, 596 F.2d 914, 916 (9th Cir. 1979) (holding that even though the party could have sought to intervene

in an action by the United States, it could not institute a separate action against the United States).[16] In this case, the United States filed a motion to vacate the arbitration award in the Central District of California on October 8, 2004, for which 28 U.S.C. § 1345 served as the basis for jurisdiction.[17] That motion followed Park Place's motion to confirm, which it had filed on September 14, 2004, in the Court of Federal Claims.[18] Because § 1345 will not support an original action by Park Place, Park Place's own jurisdictional theory depends on the fortuity of the United States' decision to file a motion to vacate, to which it could attach its motion to confirm. We do not think § 1345 can be used in this creative way. *See Orff v. United States*, 545 U.S. 596, 602-04 (2005). Moreover, even if Park Place is correct that § 1345 gave the district court jurisdiction over its motion to confirm, § 1345 plainly does not constitute a waiver of sovereign immunity.

Park Place's second jurisdictional argument is more plausible. Park Place contends that the supplemental jurisdiction statute, 28 U.S.C. § 1367, when read in conjunction with § 1345, supports the district court's jurisdiction. Park Place reasons that because the Central District of California had jurisdiction over the United States' motion to vacate under § 1345, it had supplemental jurisdiction over Park Place's motion to confirm because the motions were inextricably intertwined.

---

[16]This principle is subject to a narrow exception: "when the United States files suit it may subject itself to various compulsory and permissive counterclaims for recoupment or set-off." *Id.* at 917; *see also United States v. Shaw*, 309 U.S. 495 (1940); *United States v. Agnew*, 423 F.2d 513, 514 (9th Cir. 1970) (per curiam). As Park Place concedes, its claim is not a counterclaim permitted under such an exception.

[17]Although this motion was filed ninety-one days after the arbitration award on July 9, 2004, this appears to be "within three months after the award [was] filed" on July 8, 2004. 9 U.S.C. § 12.

[18]The United States opposed the motion on jurisdictional grounds and asked the Court of Federal Claims to treat its opposition as a motion to vacate if the court concluded it had jurisdiction.

**[22]** The text of § 1367 appears to support Park Place's argument. That section provides that "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). The Supreme Court has emphasized that "[§] 1367(a) is a broad grant of supplemental jurisdiction over other claims within the same case or controversy, as long as the action is one in which the district courts would have original jurisdiction" and cautioned against fashioning limitations on that grant without support in the statutory text. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558-59 (2005). As Park Place observes, both the United States' motion to vacate and its motion to confirm required the district court to pass upon the validity of the same arbitration award and the two claims thus clearly seem to share a "common nucleus of operative fact." *Bahrampour v. Lampert*, 356 F.3d 969, 978 (9th Cir. 2004) (internal quotation marks omitted).

**[23]** Having said that, we note that predicating jurisdiction on § 1367 is also not without difficulties. More specifically, and as noted above, the Tucker Act conditions the United States' waiver of sovereign immunity over contract-based claims seeking more than $10,000 on jurisdiction in the Court of Federal Claims. Section 1367 itself makes clear that its provisions do not apply where another federal statute "expressly provide[s] otherwise." The circuits that have considered the issue have thus rejected the argument Park Place makes here—that the exclusive jurisdiction granted to the Court of Federal Claims by the Tucker Act may be overridden by the general grant set forth in § 1367. *See Dia Nav. Co., Ltd. v. Pomeroy*, 34 F.3d 1255, 1267 (3d Cir. 1994); *Pershing Div. of Donaldson, Lufkin & Jenrette Secs. Corp. v. United States*, 22 F.3d 741, 744 (7th Cir. 1994). However, we need not definitively decide this issue because § 1367, like § 1345, does not constitute a waiver of the United States' sovereign

immunity and thus cannot support the district court's decision to confirm the arbitration award.

More broadly, we emphasize that the theory on which Park Place relies here depends entirely upon the Department of Justice's decision to file suit in the Central District of California to *vacate* the arbitration award. Had the United States not filed that suit, Park Place could not credibly suggest that § 1345 or § 1367 permitted the Central District of California to *confirm* the arbitration award. Only Congress can waive the United States' sovereign immunity, *Dunn & Black*, 492 F.3d at 1090—litigation strategy gone awry is thus generally not a sufficient condition for awarding a money judgment against the United States. *Cf. OPM v. Richmond*, 496 U.S. 414, 428 (1990) ("If agents of the Executive were able, by their unauthorized oral or written statements to citizens, to obligate the Treasury for the payment of funds, the control over public funds that the Clause reposes in Congress in effect could be transferred to the Executive.").

This case illustrates the wisdom of that rule. Under 9 U.S.C. § 12, a motion to vacate an arbitration award must be filed within three months. The United States filed the motion to vacate as a defensive measure, apparently reasoning that, if it did not do so quickly, it would forfeit its remaining arguments, including that Park Place had waived its right to elect arbitration. We will not permit such an understandable decision to open the public treasury in a manner that Congress has not authorized and that the government in no sense can be said to have consented to in filing the motion to vacate. We therefore reject this argument.[19]

---

[19]Park Place's assertion that confirmation follows as "the necessary and automatic consequence of deny[ing the] motion to vacate" inaccurately describes the FAA even in cases where sovereign immunity is not implicated. We recognize that the motions to vacate and to confirm are in some sense inversely related. Where an award has been vacated, it cannot be confirmed; conversely, where a party has properly applied for an order, a

## V.    CONCLUSION

Our reversal of the district court's judgment confirming the arbitration award essentially returns Park Place to the Court of Federal Claims, the only forum in which its contract claims may plausibly be said to belong.[20] We recognize that the Federal Circuit has seemingly suggested, albeit in a somewhat opaque disposition, that neither it nor the Court of Federal Claims may confirm the arbitration award. We express no opinion on whether this decision was correct, but we acknowledge the frustrating nature of this result for Park

court must confirm an award that has not been vacated. *See* 9 U.S.C. § 9. However, although it may be convenient for a single court to hear both motions, nothing in the FAA requires that they be brought in the same court. *See Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.*, 529 U.S. 193, 204 (2000). More importantly, a court's denial of a motion to vacate does not automatically mean that the award will be confirmed. Even where the court has denied a motion to vacate an arbitration award, a party to the arbitration must file a separate motion to confirm to empower the district court to issue an order confirming the award. *See* 9 U.S.C. § 9.

Park Place points out that § 9 states that "a court *must* grant [an order of confirmation] unless the award is vacated." (emphasis added). We think that this reads § 9 out of context. In full, § 9 provides that "any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated . . . ." Viewed in context, it is clear that the court must confirm the award where it has not been vacated, but only upon an independent motion by the parties. The word "must" operates only to restrict the court's ability to decline to confirm without grounds where confirmation is sought. The requirement that a party actually move to confirm preserves the possibility that neither side will do so because neither side is satisfied with the award. In sum, the confirmation of an award does not follow as "automatic" or "necessary" after the denial of a motion to vacate. Although the provisions are inversely related in some sense, action upon either provision may *imply* action as to the other, but does not *cause* it.

[20]We note that Park Place's contract claims remain pending in the Court of Federal Claims, but that proceedings have been stayed in that court since 2005, subject to the resolution of this litigation.

Place. In 1993, Park Place entered into a contract providing a right to arbitrate any claims arising thereunder. The Court of Federal Claims first told Park Place that it may not arbitrate there and must arbitrate elsewhere, and now we have barred Park Place from our courts. However, we have previously acknowledged that "the concept of make-whole relief inherent in much of the common-law tradition does not apply in the context of actions brought against the United States" and that "a suit against the United States must start from the opposite assumption that no relief is available." *Tucson Airport Auth.*, 136 F.3d at 644. Although we sympathize with Park Place's apparent jurisdictional predicament, we simply cannot waive sovereign immunity where Congress has not, and we cannot exercise jurisdiction where none exists. *See Christianson*, 486 U.S. at 818 ("The age-old rule that a court may not in any case, even in the interest of justice, extend its jurisdiction where none exists has always worked injustice in particular cases.").

[24] Consequently, we **AFFIRM** the district court's denial of the United States' motion to vacate the arbitration award. Because we conclude that the Central District of California lacked authority to confirm the arbitration award, we **VACATE** the district court's grant of Park Place's motion to confirm the award. We also **VACATE** the district court's denial of Park Place's motion for prejudgment and postjudgment interest. We remand this case to the district court with instructions to dismiss the confirmation action as barred by sovereign immunity. Each party shall bear its own costs and fees on appeal.

**AFFIRMED in part; VACATED in part and REMANDED.**